**Opinion issued November 5, 2015**



In The

# Court of Appeals

### For The

# First District of Texas

————————————

## NO. 01-15-00469-CV

————————————

## IN THE INTEREST OF J.-M. A.Y., A MINOR CHILD

———————————————————————————————

On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2014-01481J

———————————————————————————————

\* \* \* \*

In The

# Court of Appeals

### For The

# First District of Texas

————————————

## NO. 01-15-00589-CV

————————————

**IN THE INTEREST OF T.J.C., II, A MINOR CHILD**

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-01481J-A**

**MEMORANDUM OPINION**

In these two appeals, J.T.D. ("Mother") challenges the final judgments signed by the trial court terminating her parental rights to her two sons, four-year-old J.-M.A.Y. and eight-year-old T.J.C. Mother raises two identical issues in each appeal in which she challenges the legal and factual sufficiency of the evidence supporting the termination of her parental rights.

**Background**

On March 18, 2014, the Department of Family and Protective Services ("the Department") filed suit, requesting the trial court to issue temporary orders appointing the Department as the temporary sole managing conservator of J.-M.A.Y. and T.J.C. If family reunification could not be achieved, the Department sought to terminate Mother's parental rights to her children. The Department offered the affidavit of its representative, Donna Lovings, to support its petition.

In her affidavit, Lovings stated that, on March 3, 2014, the Department received a referral regarding "neglectful supervision" by Mother of T.J.C. According to the report, Mother had allowed an uncle to take T.J.C. with him to

buy marijuana. The report also stated that Mother smokes marijuana when her children are present. Lovings testified, "[Mother] has a history of mental illness and is not on her medication."

After receiving the referral, Lovings conducted an investigation. Lovings stated in her affidavit that, on March 10, 2014, she visited Mother and the children at their home. According to Lovings, as soon as she entered the home, she smelled a strong odor of marijuana. The children were present in the home at the time. When Lovings informed Mother of the allegations that had been made, Mother "became very emotional and aggressive by hitting on the door and cursing loudly." Lovings stated, "[Mother] would not cooperate with the interview and she continued to have outbursts. [Mother] would answer her phone, curse, and would not sit still long enough to hear the questions I asked." Mother admitted to Lovings that she smoked marijuana but denied smoking it with the children in the same room. Mother also admitted that she would not pass a drug test. Mother indicated to Lovings that she had not been taking her psychiatric medications. Mother also told Lovings that she planned to check herself into a mental health hospital.

Lovings also testified in the affidavit that she had spoken with the oldest child, T.J.C. T.J.C. had "disclosed that he's afraid of his mother because she curses him out and hits him with her fist in his arm. He stated that she also makes

him do pushups and hits him with a hanger or belt in his side or stomach when he gets into trouble." T.J.C. denied accompanying anyone to buy marijuana. However, he told Lovings that Mother smoked marijuana in the home when he and J.-M.A.Y. were there.

On March 14, 2014, Lovings stated she learned that the children were in the care of the maternal grandmother. Three days later, Lovings visited the home of the grandmother. Mother was also present. Lovings testified that Mother stated that she had been in the hospital and had been diagnosed with bipolar disorder. During the visit, Mother "was again very aggressive." She again admitted to using marijuana but not in the children's presence. Lovings told Mother that the children needed to be placed in a safe environment outside of Mother's care. Mother agreed the children could stay with the maternal grandmother.

Lovings also detailed the family's CPS history. She explained that, in 2009, CPS became involved when Mother was arrested for driving while under the influence of marijuana with then two-year-old T.J.C. in the car. CPS again became involved with the family in August 2012, when T.J.C.'s father did not supervise him properly, and T.J.C. nearly drowned in a pool. During the investigation, Mother was found not to be taking her psychiatric medication and tested positive for marijuana. The case was closed when "safety factors were eliminated."

4

CPS had last become involved in November 2013, when there was a report that Mother was hitting T.J.C. in his "private parts . . . as punishment." It was determined that Mother had been off her psychiatric medications for five months. Mother was reported to be "very aggressive and hostile." The case was resolved when Mother agreed to allow T.J.C. "to go with his father" until she stabilized on her medication.

Lovings's affidavit also detailed Mother's criminal history which included illegal drug possession. In addition, Lovings's affidavit indicated that T.J.C.'s father had criminal charges pending against him for the offenses of injury to a child and assault to a family member. Lovings further stated that the T.J.C.'s father "has a long and concerning criminal history involving drugs."

Following the April 1, 2014 adversary hearing, at which Mother appeared, the trial court signed an order appointing the Department as temporary managing conservator of the children. Mother signed and agreed to follow a family service plan. The plan set out several tasks and services for Mother to complete before she would be reunited with her children. The service plan required Mother to complete the following tasks and services: (1) participate in anger-management therapy; (2) attend domestic-abuse classes; (3) actively participate in a psychiatric evaluation; (4) complete parenting classes; (5) fully participate in a drug and alcohol assessment; (6) follow all recommended in-patient or out-patient drug treatment

5

programs; (7) submit to random drug testing, which must be negative at all times; (8) maintain a legal form of employment; (9) acquire and maintain stable housing; (10) maintain contact with her children; (11) refrain from engaging in illegal activities; (12) maintain safe housing; (13) inform her caseworker of telephone and address changes; (14) submit to a psycho-social evaluation; and (15) attend all court hearings.

The family service plan warned Mother as follows:

> This is a very important document. Its purpose is to help you provide your child with a safe environment within the reasonable period specified in the plan. If you are unwilling or unable to provide your child with a safe environment, your parental and custodial duties and rights may be restricted or terminated or your child may not be returned to you. There will be a court hearing at which a judge will review this service plan.

After being removed from Mother, J.-M.A.Y. and T.J.C. were placed in foster care for a number of months. In August 2014, the children went to live with their maternal grandfather.

In December 2014, on the motion of the Department, the trial court severed the suit regarding T.J.C. from the suit regarding J.-M.A.Y. Although severed into separate cause numbers, the two cases were tried together to the bench in April 2015. At trial, the Department sought to terminate the parent-child relationship between Mother and the two children.

The Department presented evidence establishing that Mother tested positive for marijuana and cocaine throughout the pendency of the case. The evidence showed that, although she completed most of the family service plan's tasks and services, Mother did not complete the recommended drug-treatment programs. Mother also did not submit to testing recommended to ensure that she was taking her bipolar medication.

The Department's caseworker testified that T.J.C. told her he was afraid of Mother because she would punch and hit him. T.J.C. also told the caseworker that, "not only [was he] around marijuana, but marijuana was smoked in the same room as him."

The evidence further showed that T.J.C. and J.-M.A.Y. were doing very well in their grandfather's care. The grandfather testified that he would be willing to adopt the two children should the court decide to terminate the parents' rights.

At the end of trial, the trial court rendered judgment terminating the parent–child relationship between Mother and her two children.[1] Under each cause number, the trial court found that clear and convincing evidence showed (1)

---

[1] J.-M.A.Y. and T.J.C. each have a different father. The trial court also terminated the parent-child relationship between each boy and his respective father. The fathers have not appealed. In addition, the maternal grandmother filed a petition in intervention, seeking to be appointed the boys' sole managing conservator. The grandmother did not appear at trial, and the trial court denied her requested relief. The grandmother also has not appealed.

Mother had knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being; (3) Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children; and (4) termination of her parental rights was in the children's best interest.[2] The trial court appointed the Department as the sole managing conservator of the two children.

These appeals followed. Mother raises the same two issues in each appeal, challenging the sufficiency of the evidence to support the trial court's findings.

## Sufficiency of the Evidence

In two issues, Mother claims that the evidence was not legally or factually sufficient (1) to support the trial court's predicate finding that she, or someone with whom she placed the children, had engaged in endangering conduct or (2) to

---

[2] *See* Act of May 19, 1997, 75th Leg., R.S., ch. 575, § 9, sec. 161.001(1)(D),(E),(O), (2), 1997 Tex.Gen. Laws 2012, 2014–15, *amended by* Act of Mar. 30, 2015, 84th Leg., R.S., Ch. 1, S.B. 219, art. 1, § 1.078, sec. 161.001(b)(1)(D),(E),(O), (b)(2) (West, Westlaw through 2015 Reg. Sess.). We note that the recent amendment to section 161.001 does not affect the resolution of Mother's appeal. Provisions identical in substance to the applicable provisions of the former version of the statute appear in the current version. However, the subsections have been renumbered.

support the trial court's determination that termination was in the children's best interests.

## A. Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. Act of May 19, 1997, 75th Leg., R.S., ch. 575, § 9, sec. 161.001(1), 1997 Tex. Gen. Laws 2012, 2014–15 (amended 2015); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This heightened standard of review is mandated not only by the Family Code but also by the Due Process Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *see also Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 1394–95 (1982) (recognizing fundamental liberty interest parent has in his or her child and concluding that state must provide parent with fundamentally fair procedures, including clear and convincing evidentiary standard, when seeking to terminate parental rights). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *J.F.C.*, 96 S.W.3d at 264. Here, the Department was required to establish, by clear and convincing evidence, that Mother's actions satisfied one of the grounds listed in former Family Code section 161.001(1) and that termination was in the children's best interest. *See* Act of May 19, 1997, 75th

9

Leg., R.S., ch. 575, § 9, sec. 161.001(1), (2), 1997 Tex. Gen. Laws 2012, 2014–15 (amended 2015).

When determining legal sufficiency, we review all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence

10

rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

We are mindful that the natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20–21; *see also In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012). However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical

11

interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26; *see also In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013).

## B.     Unchallenged Predicate Findings

In her first issue, Mother asserts that the evidence was legally and factually insufficient to support the trial court's predicate statutory finding that termination was warranted under former Family Code subsection 161.001(1)(E) because Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. However, the trial court also found that termination of Mother's parental rights was warranted under subsections (D) and (O). Mother does not challenge these predicate grounds. Because the judgment could be affirmed on these unchallenged grounds, we uphold the judgment concerning the statutory grounds for termination and do not address Mother's challenge to the sufficiency of the evidence under subsection (E). *See Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.–Houston [1st Dist.] 2009, no pet.); *Conti v. Tex. Dept. of Family & Protective Services*, 01–10–00185–CV, 2011 WL 286143, at *4 (Tex. App.— Houston [1st Dist.] Jan. 27, 2011, pet. denied) (mem. op.); *see also In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (holding that only one predicate finding under section 161.001(1) is necessary to support termination judgment when there is also finding that termination is in child's best interest).

We overrule Mother's first issue in each appeal.

## C. Best-Interest Finding

### 1. *Applicable Legal Principles*

There is a strong presumption that the best interest of the child will be served by preserving the parent–child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West, Westlaw through 2015 R. Sess.).[3] Among others, the following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of

---

[3] The Texas Legislature recently amended Family Code section 263.307. *See* Act of Mar. 30, 2015, 84th Leg., R.S., Ch. 1, S.B. 219, art. 1, § 1.181, sec. 263.307 (West, Westlaw through 2015 Reg. Sess.). However, the revisions to the statute were minor and did not change the statutory language cited herein. Nor did the amendment affect the numbering of the statutory provisions. Thus, we cite to the current version of the statute.

abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with minimally adequate health and nutritional care, guidance and supervision, and a safe physical home environment; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

The Supreme Court of Texas has set out some additional factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the

14

stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest. *C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *See In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent–child relationship. *C.H.*, 89 S.W.3d at 28; *In re H.D.*, No. 01–12–00007–CV, 2013 WL 1928799, at *13 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.). Furthermore, in conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence. *See H.D.*, 2013 WL 1928799, at *13.

2. *Analysis*

Multiple factors support the trial court's determination that termination of Mother's parental rights was in the children's best interest. The trial court heard

15

evidence that Mother had engaged in chronic, reoccurring illegal drug use. Parental drug abuse reflects poor judgment and may be a factor to be considered in determining a child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(b)(8) (providing that courts may consider whether there is history of substance abuse by child's family). Evidence relating to Mother's involvement with illegal drugs supported the trial court's best interest finding under the following *Holley* factors: the children's emotional and physical needs now and in the future; the emotional and physical danger to the children now and in the future; and acts or omissions indicating that the existing parent-child relationship is not a proper one. *See Holley,* 544 S.W.2d at 371–72 (listed above as *Holley* factors two, three, and eight). A parent's drug use has also been found to be a condition that can indicate instability in the home environment. *In re J.M.*, No. 01–14–00826–CV, 2015 WL 1020316, at *7 (Tex. App. Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.).

The evidence showed that Mother had been involved with illegal drugs for many years. T.L.C.'s father testified that he and Mother smoked marijuana together when they were a couple. They have been separated more than eight years. The evidence showed that Mother was convicted of the offense of possession of marijuana in 2009, when T.J.C. was two years old.

At trial, Mother admitted that, in early 2014, she was selling crack cocaine as a means to make money. Mother stated that she stopped selling cocaine when

the Department began investigating this case in March 2014. She indicated that if the Department had not gotten involved, she would still be selling cocaine. In addition, the caseworker testified that T.J.C. told her a number of times that marijuana was used in the home while he was present. We note that a parent's exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care for a child. *Id.*

Mother denied the allegation that T.J.C. went along to buy marijuana. Mother admitted to smoking marijuana but testified that she last smoked marijuana in March 2014. Mother also denied that she had used cocaine. Despite Mother's claims, the Department offered evidence, in the form of both lab reports and testimony, showing that Mother had used marijuana and cocaine throughout the pendency of the case. Mother was tested for drugs in April 2014, May 2014, July 2014, August 2014, December 2014, and March 2015. Mother did not have a negative drug test at any point during the case.

Mother tested positive for having ingested cocaine in July 2014 and in March 2015. The outside of her hair tested positive for cocaine in April 2014, May 2014, and December 2014, indicating that Mother had been in an environment where cocaine had been present. She also tested positive for ingesting marijuana in April 2014, May 2014, December 2014, and March 2015. The outside of Mother's hair tested positive for marijuana in August 2014.

Mother testified that she had been unsuccessfully discharged from drug counseling because she had tested positive for cocaine. The caseworker testified that, under the family service plan, Mother had been directed to complete an in-patient drug treatment program to address her continuing cocaine use. The caseworker stated that Mother had not complied with this requirement. *See* TEX. FAM. CODE ANN. § 263.307(b)(10) (providing that courts may consider the willingness and ability of child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision). Mother's failure to complete her drug services is particularly relevant because the reason the children came into the Department's custody was related to Mother's drug use. In making the best-interest determination, courts may consider the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time. *See id.* § 263.307(b)(11). Moreover, a factfinder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her children that she does not have the ability to motivate herself to seek out available resources needed now or in the future. *See J.M.*, 2015 WL 1020316, at *7; *see also Holley*, 544 S.W.2d at 371–72 (listing as best-interest factor parental abilities of individual seeking custody).

The evidence also showed that Mother has bipolar disorder. At trial, Mother testified that she is taking medication for this condition. However, the caseworker testified that Mother had failed to submit to blood testing to confirm that she was taking her medication. From this, the trial court could have inferred that Mother was not in compliance with her medication needs. Non-compliance with her psychiatric medication is not consistent with providing a safe and stable environment for the children. *See In re L.L.F.*, No. 02–11–00485–CV, 2012 WL 2923291, at *16–17 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) (considering parent's failure to take prescribed medication for bipolar disorder as factor in determining whether termination was in best interest of child).

In addition, evidence was presented at trial indicating that Mother had been physically abusive to T.J.C. *See* TEX. FAM. CODE ANN. § 263.307(b)(5), (7) (providing that courts may consider whether child is fearful of living in or returning to child's home and whether there is history of abusive or assaultive conduct by child's family). The caseworker testified that T.J.C. told her that he was afraid of Mother. T.J.C. confided to the caseworker that Mother had punched him in his leg and in his arm. *See Holley*, 544 S.W.2d at 371–72 (listing emotional and physical danger to child now and in future and parental abilities of individual seeking custody as factors). Relevant to this, the evidence showed that Mother had completed her anger management class. However, at trial, the caseworker testified

19

that she had observed Mother raise her fist to T.J.C.'s father while they were in the courtroom. The caseworker then saw Mother's father escort her out of the courtroom. The caseworker testified that, to her, this behavior indicated that Mother had not "learned anything from anger management" classes. *See* TEX. FAM. CODE ANN. § 263.307(b)(11) (listing willingness and ability of child's family to effect positive personal changes within a reasonable period of time as a factor to consider).

We note that evidence was presented weighing in Mother's favor regarding the best-interest determination. Evidence showed that Mother had completed many of the tasks and services required in the family service plan. Mother also testified that she was living with her mother and that she was earning a living as a hairdresser. However, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Importantly, the evidence indicated that Mother continued to struggle with drug abuse, the issue that had led to the children being placed in the Department's care.

Mother also acknowledged that the children had been taken into CPS custody and placed in foster care at least two other times because of her behavior. Mother agreed that it was not fair to her children that they had been placed in foster care three times during their lives. *See* TEX. FAM. CODE ANN.

§ 263.307(b)(2) (providing that courts may consider frequency and nature of out-of-home placements as factor).

Lastly, evidence was presented relevant to future plans for the children. *See Holley,* 544 S.W.2d at 371–72 (listed above as *Holley* factor six). The evidence showed that the children have been living with their maternal grandfather since August 2014. The caseworker testified that the two boys are doing "very well" in their grandfather's care. She stated that both children are developmentally on target and do not have special needs. T.J.C. is doing well in school, making all "As." She indicated that T.J.C. has some behavioral issues but that those problems are being addressed.

Although she wanted her children returned to her care, Mother does not dispute that her father is providing a safe, stable, and nurturing environment for the children. With regard to the care her father is providing, Mother testified:

> He takes [the children] to school. He picks them up. They eat great meals everyday. They mow the yard with him. They do manly things that should be done. You know what I'm sayin'? They go out places. Baseball games, . . . basketball. He keeps them involved in YMCA activities. It's a lot. I mean, I can go on for days about what he does for them.

In her brief, Mother asserts that the evidence was not legally and factually sufficient to support the best-interest finding because the evidence showed that "the maternal grandfather did not want to adopt the children." Mother points out that the grandfather stated that it was not his desire to adopt the children. She also

points to the testimony of a child advocate, who stated that the grandfather "has stated to us, even today, that adoption is not what he is going for." Mother, however, takes this evidence out of context.

The grandfather testified that he was willing to provide long-term care for his grandsons. He explained that he was not actively seeking to adopt the children. Rather, he had hoped his daughter would turn her life around by getting off drugs so that she could regain custody of her children. When asked directly whether he would adopt the boys if the parents' rights were terminated, the grandfather testified that he would adopt them.

In any event, although the Supreme Court of Texas has stated that "[e]vidence about placement plans and adoption are, of course, relevant to best interest," the court made clear that "the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *C.H.*, 89 S.W.3d at 28. "Instead, the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in

the child's best interest—even if the agency is unable to identify with precision the child's future home environment." [4]  *Id.*; *accord E.C.R.*, 402 S.W.3d at 250.

After viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of the parent–child relationship between Mother and her children was in the children's best interest.  We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's finding that termination of the parent–child relationship between Mother and the children was in the children's best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in the children's best interest.  Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent–child relationship was in the children's best interest.

We overrule Mother's second issue in each appeal.

---

[4]  We note that evidence regarding a number of the *Holley* factors was not presented. However, the Department is not required to prove all of the factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

23

**Conclusion**

We affirm the judgments of the trial court.


                                            Laura Carter Higley
                                            Justice

Panel consists of Justices Jennings, Higley, and Brown.